UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CIVIL ACTION NO. 3:18-CV-549-CRS

RICCY MABEL ENRIQUEZ-PERDOMO                                          PLAINTIFF

v.

RICARDO A. NEWMAN*, et al.*                                          DEFENDANTS

### MEMORANDUM OPINION

Plaintiff Riccy Mabel Enriquez-Perdomo brought this *Bivens* action against defendants Immigration and Customs Enforcement ("ICE") agents Ricardo A. Newman, Joseph M. Phelps, John R. Korkin, and Shawn Byers in their individual capacities. This matter is before the court on Defendants' renewed Motion for a summary judgment. DN 91. The Motion is ripe for adjudication. Because Enriquez-Perdomo's claims arise in new *Bivens* contexts and the Congress is better suited to craft a remedy for her alleged harms, Defendants' Motion will be granted.

### I. Background

Enriquez-Perdomo, a Honduran national, Complaint, DN 1 at ¶ 1, PageID# 2, unlawfully entered the United States in 2004, Order of Removal, DN 61-1 at PageID# 571. She was a minor at the time. Ultimately, her unlawful entry was detected by the U.S. Department of Justice's Immigration and Naturalization Service, which scheduled a removal hearing. *See id.* at PageID# 575. Enriquez-Perdomo failed to appear. *Id.* An Immigration Law Judge ("ILJ") ordered Enriquez-Perdomo to be removed from the United States, *id.* at PageID# 575–77, and arrangements were made for her deportation to Honduras, *id.* at PageID# 574. However, Enriquez-Perdomo did not board the flight and, thus, did not leave the United States.

Eventually, Enriquez-Perdomo benefitted from the Deferred Action for Childhood Arrivals ("DACA") program. *See* Complaint, DN 1 at ¶ 11, PageID# 4. "That program allows certain

unauthorized aliens who entered the United States as children to apply for a two-year forbearance of removal." *Dept. of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 8 (2020). Allegedly, Enriquez-Perdomo properly maintained her DACA beneficiary status such that it never lapsed. *See* Complaint, DN 1 at ¶¶ 11–12, PageID# 4.

Residing in the United States with authorization, Enriquez-Perdomo frequently visited Louisville's ICE office to post bond for detained people. *Id.* at ¶¶ 8–10, PageID# 2. During one such visit, Defendants, aware of Enriquez-Perdomo's DACA status, detained her pursuant to the ILJ's Order of Removal. *Id.* at ¶¶ 13–14, PageID# 5; Order of Removal, DN 61-1 at PageID# 575–77. Subsequently, Enriquez-Perdomo was held "in over nine (9) different locations throughout Kentucky, Indiana, and Illinois" before being released. Complaint, DN 1 at ¶¶ 18, 20, PageID# 5. She alleges these actions were "motivated in substantial part by her ethnic background". *Id.* at ¶ 27, at PageID# 6. While detained, Enriquez-Perdomo petitioned the U.S. District Court for the Eastern District of Kentucky for habeas relief, but that court denied her petition as moot because she was released before it could act. *See Enriquez-Perdomo v. Sessions, et al.*, No. 2:17-cv-147-DLB, 2018 WL 934854, at *2 (E.D. Ky. Feb. 16, 2018).[1]

Now, Enriquez-Perdomo seeks money damages to redress the defendant ICE agents' alleged violations of her Fourth and Fifth Amendment rights. Complaint, DN 1 at ¶ 28, PageID# 6. More specifically, Enriquez-Perdomo alleges that these ICE agents (1) arrested and detained her for the purpose of deportation despite knowing that she was registered under DACA, *id.* at ¶ 14, PageID# 6, (2) unlawfully failed to provide her with a hearing prior to her arrest, *id.* at ¶ 45,

---

[1] Of note, in the same action, Enriquez-Perdomo brought *Bivens* claims against then-U.S. Attorney General Jeff Sessions, then-U.S. Deputy Secretary of Homeland Security Elaine Duke, and several unnamed ICE agents. *Enriquez-Perdomo*, 2018 WL 934854, at *1. All her *Bivens* claims were dismissed, however, as they were brought against the defendants in their official capacities. *Id.* at *3–4.

PageID# 8, and (3) denied her equal protection of the law as the ICE agents were "motivated in substantial part by her ethnic origin".[2] *Id.* at ¶ 48, PageID# 9.

For her causes of action, Enriquez-Perdomo relies on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and *Davis v. Passman*, 442 U.S. 228 (1979). *Bivens* held that a Fourth Amendment violation "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct." *Bivens*, 403 U.S. at 389. *Davis* held that a Fifth Amendment violation arising from a U.S. Congressman's decision to terminate the employment of a staff member because she was a woman "may be redressed by a damages remedy." *Davis*, 442 U.S. at 249.

## II. Procedural History

After permitting limited jurisdictional discovery, the court dismissed Enriquez-Perdomo's Complaint, reasoning that 8 U.S.C. § 1252(g) deprived the court of subject-matter jurisdiction because Enriquez-Perdomo's claims arose from the execution of a valid Order of Removal. 11/13/20 Mem. Op., DN 62 at PageID# 603. The Sixth Circuit Court of Appeals reversed in part, holding that § 1252(g)'s jurisdiction-stripping provision contemplates only "executable" removal orders and that Enriquez-Perdomo's removal order was non-executable because of her DACA status. *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 863–67 (6th Cir. 2022).

The Sixth Circuit emphasized that its "only concern" was "the jurisdictional question" and that it declined to "assess the merits of" Enriquez-Perdomo's remaining *Bivens* claims "or any defenses to those claims." *Id.* at 869–70. It did so because of the inherent "complexity of the question presented and the need for comprehensive briefing." *Id.* at 869. Thus, the Sixth Circuit

---

[2] Enriquez-Perdomo also brought a *Bivens* claim against Defendants under a First Amendment retaliation theory. The court dismissed that count by prior Order, DN 63, and the U.S. Court of Appeals for the Sixth Circuit affirmed, *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 869 (6th Cir. 2022) ("Enriquez-Perdomo's First Amendment retaliation claim is not viable after *Egbert*.").

remanded the matter with instructions for this court to consider "in the first instance" whether there is a *Bivens* remedy for Enriquez-Perdomo's remaining claims: warrantless arrest and unlawful detention in violation of the Fourth Amendment and deprivation of due process and equal protection in violation of the Fifth Amendment. *Id.* at 869–70.

After the Sixth Circuit's mandate issued, the court held a pretrial conference to discuss the case's procedural posture and ordered Defendants to brief the *Bivens* issue no later than October 16, 2023. Memo. of Pretrial Conf., DN 72 at PageID# 643. On July 5, 2023, Defendants filed their first Motion for a summary judgment. DN 74. The court denied that Motion without prejudice as to refiling because Defendants assumed—and thus neglected to argue—that this case presents a new *Bivens* context. 3/19/2024 Mem. Op. & Order, DN 90. Defendants filed a renewed Motion for a summary judgment, DN 91, that is now ripe for adjudication.

### III. Legal Standard

It is appropriate to enter a summary judgment when the moving party shows that there is not a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Here, for the purpose of their Motion, Defendants contend that the court need not resolve the disputed facts— whether Enriquez-Perdomo's Fourth and Fifth Amendment rights were violated—because, when those facts are viewed in Enriquez-Perdomo's favor, Defendants remain entitled to a favorable summary judgment.[3] Renewed Mot. Sum. Judg., DN 91 at PageID# 873, 878. Therefore, the court will credit Enriquez-Perdomo's account of the facts and consider whether Defendants are entitled to a judgment as a matter of law on Enriquez-Perdomo's remaining *Bivens* claims.

---

[3] Defendants' position differs slightly from that advanced in their first Motion for a summary judgment, where they simply conceded all disputed facts for purposes of the Motion. Mot. Sum. Judg., DN 74 at PageID# 664.

## IV. Analysis

### A. *Bivens'* Development.

The U.S. Constitution divides our government into three branches: the Legislature, the Executive, and the Judiciary. U.S. CONST., art. I, II, III. Chief Justice John Marshall summarized each branch's function in this way: "the legislature makes, the executive executes, and the judiciary construes the law." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825). "One branch of government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." *Sinking-Fund Cases*, 99 U.S. 700, 718 (1879) (Waite, C.J.). This is particularly true of the delicate balance between the Legislature and the Judiciary: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for THE JUDGE would then be THE LEGISLATOR." FEDERALIST NO. 47 (James Madison) (quoting MONTESQUIEU, THE SPIRIT OF THE LAWS 11.6 (1748)).[4]

Notwithstanding the delicate balance that must be struck between the Judiciary and Legislature, during our Republic's first two centuries, it was a settled principle that the Judiciary

---

[4] Although our Nation's Founders sought to establish a *novus ordo seclorum* ("new order of the ages"), the principle expressed in Federalist No. 47 was not a new one. Indeed, the same was expressed by Aristotle much earlier: "well-drawn laws should themselves define all the points they possibly can and leave as few as may be to the decision of the judges." ARISTOTLE, RHETORIC I, 1 (c. 350 B.C.) (W. Rhys Roberts trans.). In the thirteenth-century, Thomas Aquinas concurred with Aristotle's assessment for three reasons:

> First, because it is easier to find a few wise men competent to frame right laws, than to find the many who would be necessary to judge aright of each single case. Secondly, because those who make laws consider long beforehand what laws to make; whereas judgment on each single case has to be pronounced as soon as it arises: and it is easier for man to see what is right, by taking many instances into consideration, than by considering one solitary fact. Thirdly, because lawgivers judge in the abstract and of future events; whereas those who sit in judgment of things present, towards which they are affected by love, hatred, or some kind of cupidity; wherefore their judgment is perverted.

THOMAS AQUINAS, SUMMA THEOLOGIAE pt. I-II, q. 95, art. 1 (Fathers of the English Dominican Province trans., 2d rev. ed., Burns Oates & Washbourne, 1920) (c. 1265–74).

enjoyed an inherent power to craft appropriate remedies for parties injured at law, even absent congressional direction. Indeed, the U.S. Reports are stuffed with cases encouraging federal judges to do just that. One such case is *Bell v. Hood*, where the Supreme Court explained:

> where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.

327 U.S. 678, 684 (1946) (collecting cases).[5]

Importantly, the judicial construction of remedies is a practice inherited from the English common law tradition. *See, e.g.*, *Keeble v. Hickeringill*, 103 Eng. Rep. 1127 (1709) (sustaining trespass on the case action and permitting a judicially created damages remedy); 3 WILLIAM BLACKSTONE, COMMENTARIES *42 (1768) (the Court of Common Pleas "commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy"). In 1938, however—the same year law and equity were merged into a single civil jurisdiction by adoption of the Federal Rules of Civil Procedure—the U.S. Supreme Court determined that there "is no federal general common law." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).[6] This holding was predicated on an understanding of authority which diverged from that of the English tradition: "The common law so far as it is enforced in a State, whether called common law or not,

---

[5] These cases include *Marbury v. Madison*, 1 Cranch. 137, 162–63 (1803) (Marshall, C.J.) (where there is a legal right, there is also a legal remedy by action at law); *United States v. Kaufman*, 96 U.S. 567 (1877) (Waite, C.J.) (liability created by statute without a remedy may be enforced by a common law action); *United States v. Real Estate Sav. Bank*, 104 U.S. 728 (1881) (Waite, C.J.) (same); *Texas & N.O.R. Co. v. Brotherhood of Ry. & S. S. Clerks*, 281 U.S. 548, 569–70 (1930) (Hughes, C.J.) (same); *Bd. of Comm'rs of Jackson Cnty. v. United States*, 308 U.S. 343, 349–50 (1939) (same, and drawing on equitable principles to fashion a "flexible" rule "attributable to the Constitution" suitable for resolving a dispute between "two governments within the same territory"—the United States and Kansas).

[6] Despite this broad pronouncement, the Supreme Court later recognized that federal common law still exists in two instances: where a federal rule is "necessary to protect uniquely federal interests" and where "Congress has given the courts the power to develop substantive law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981).

is not the common law generally but the law of that State existing by the authority of that State without regard to what it may have been in England or anywhere else." *Id.* at 79 (quoting *Kuhn v. Fairmont Coal Co.*, 215 U.S. 349, 370–72 (1910) (Holmes, J., dissenting)).

Expectedly, *Erie* later called into question the nineteenth and twentieth-century decisions that approved of the judicial creation of remedies: "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) (Scalia, J., concurring). In the end, that sentiment won the day (at least when statutes are at issue). Now, there is a bright-line rule that federal judges may not create a remedy for a statutory harm "no matter how desirable" one may be, nor "how compatible" one would be "with the statute." *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001).

Still, whether the *Alexander* prohibition applies with equal force to the judicial creation of remedies for constitutional harms is less certain. For instance, in the late-twentieth century, the Supreme Court authorized damages remedies for constitutional violations *three* times:

- First, for a plaintiff who alleged that federal narcotics agents searched his home without a warrant and arrested him thereafter, all in violation of the Fourth Amendment. *Bivens*, 403 U.S. at 389–90.
- Second, against a member of Congress for workplace sex discrimination in violation of the Fifth Amendment. *Davis*, 442 U.S. at 230, 248–49.
- Third, and finally, against federal prison officials for failure to provide adequate medical care in violation of the Eighth Amendment. *Carlson v. Green*, 446 U.S. 14, 16, 19 (1980).

Taken together, *Bivens*, *Davis*, and *Carlson* empower federal courts to permit a damages remedy where a party is "deprived of rights secured by the Constitution or laws of the United States," "the defendants who allegedly deprived him of those rights acted under color of federal

law," and there is no statutory remedy for the harm. *Marie v. Am. Red Cross*, 771 F.3d 344, 364 (6th Cir. 2014). But that is not how this story ends.

Recall that, according to *Erie*, there is no general federal common law. 304 U.S. at 78. So, when deciding *Bivens* and its progeny, the Supreme Court was faced with the unenviable task of locating the source of its implied power to craft remedies for constitutional violations without reliance on the common law tradition. In a concurring opinion accompanying *Bivens*, Justice John M. Harlan II explained that this implied power is derivative of general federal-question jurisdiction: "at least after *Erie*", a federal court's power to grant relief in a non-diversity action "depends on the presence of a substantive right derived from federal law." *Bivens*, 403 U.S. at 400 (Harlan II, J., concurring). Thus, Justice Harlan II explained, when "vested with jurisdiction over the subject matter of a suit," a federal court "has the power—and therefore the duty—to make principled choices among traditional judicial remedies." *Id.* at 408 n.8 (Harlan II, J., concurring).

Seven years later, the Supreme Court confirmed Justice Harlan II's view in a majority opinion: "*Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 487, 504 (1978). The same was affirmed again two decades later: "Our authority to imply a new constitutional tort, not expressly authorized by statute, is anchored in our general jurisdiction to decide all cases 'arising under the Constitution, laws, or treaties of the United States.'" *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (quoting 28 U.S.C. § 1331). Thus, to "appropriately invoke the power of the court"—that is, to set forth a cause of action[7]—a plaintiff

---

[7] As explained in *Davis*, "the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive. The concept of a 'cause of action' is employed specifically to determine who may judicially enforce the statutory rights or obligations." 442 U.S. at 239.

needed only to allege a violation of a justiciable constitutional right. *Davis*, 442 U.S. at 239 n.18; *Bivens*, 403 U.S. at 401 n.3. Whether a remedy would be appropriate to aggrieve the matter was a separate consideration to be resolved under traditional modes of judging. *Davis*, 442 U.S. at 242.

Now, however, merely alleging a violation of a justiciable constitutional right is insufficient to state a cause of action. Why? Separation-of-powers concerns."[C]reating a cause of action is a legislative endeavor" reserved to the Congress, *Egbert v. Boule*, 596 U.S. 482, 491 (2022), thus, "it is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action for damages against federal officials in order to remedy a constitutional violation." *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017); *see Hernández v. Mesa*, 589 U.S. 93, 118 (2020) (suggesting the Congress, not courts, must provide a "cause of action" against federal officers) (Thomas, J., concurring).

Accordingly, the Supreme Court now doubts *Bivens*' conclusion that federal-question jurisdiction contemplates an implied judicial power to create causes of action for constitutional harms. Instead, the Supreme Court suspects that such a power is derived from the common law. In 2007, the Supreme Court recognized as much in *Wilkie v. Robinson*, where it observed that courts considering whether a *Bivens* action lies must "weigh[] reasons for and against the creation of a new cause of action, the way common law judges always have done". 551 U.S. 537, 554 (2007). And most recently, the Supreme Court—in no uncertain terms—explained that "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action— decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition." *Egbert*, 596 U.S. at 491 (quoting *Malesko*, 534 U.S. at 75) (Scalia, J., joined by Thomas, J.,

concurring)). Without a common law, the Supreme Court suggests there is no justification for federal judges to create causes of action for constitutional harms. *Hernández*, 589 U.S. at 100.

Concerned that the practice established in *Bivens* usurps the Congress of its legislative authority, the Supreme Court views *Bivens* and its progeny with great suspicion, *Egbert*, 596 U.S. at 501–02, such that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 582 U.S. at 135. The Supreme Court has even declared that if it "were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. at 502. In the same breath, however, it declined to overrule *Bivens*. *Id.* So—at least for now—*Bivens* remains good law.

### B. Applying *Bivens*.

Unlike its historical development, *Bivens*' application is rather straightforward: "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*, [*Davis*], or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law." *Ziglar*, 582 U.S. at 501. That analytic framework has since been condensed to a two-part test:

(1) Does the case present a new context meaningfully different from *Bivens*, *Davis*, and *Carlson*?

(2) If so, do "special factors" indicate that "the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed'"?

*Egbert*, 596 U.S. at 492 (quoting *Ziglar*, 582 U.S. at 136). If the answer to both inquiries is "yes," then a *Bivens* action is unavailable. Of note, the Supreme Court recently explained that the two inquiries "often" collapse into one: "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* But in so observing, the Supreme Court did not abandon the two-part inquiry.

As to the first inquiry, some differences "will be so trivial that they will not suffice to create a new *Bivens* context." *Ziglar*, 582 U.S. at 149. So, the first question begs another: what does it mean for a case to be meaningfully different than *Bivens* and its progeny? To guide our analysis, the Supreme Court prepared a non-exhaustive list of differences that "may" be "meaningful":

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 140. Additionally, a case may be meaningfully different when "a new category of defendants" is sued. *Hernández*, 589 U.S. at 102 (quoting *Malesko*, 534 U.S. at 68). And, critically, a *Bivens* "claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* at 103. In short, the "context is new if it differs in virtually any way from the *Bivens* trilogy." *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 883 (6th Cir. 2021).

Likewise, there are some things to consider regarding the second inquiry. Namely, that the "inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action." *Egbert*, 596 U.S. at 496. Therefore, for this inquiry, a court "faces only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* (quoting *Ziglar*, 582 U.S. at 136) (emphasis in original). This inquiry should not be made at a narrow level of generality,

lest the court "impair governmental interests, and thereby frustrate Congress' policymaking role."[8] *Id.*

In sum, at present, unless a case essentially tracks the facts of *Bivens*, *Davis*, or *Carlson*, it will arise in a new *Bivens* context under the first prong, and nearly all such claims are doomed to fail on the second prong. So, when a court is asked to expand *Bivens*' reach, its "answer will almost always be" no. *Elhady*, 18 F.4th at 883.

### 1. These claims arise in new *Bivens* contexts.

Defendants submit that Enriquez-Perdomo's claims arise in new *Bivens* contexts. Renewed Mot. Sum. Judg., DN 91 at PageID# 858–64. Enriquez-Perdomo disagrees. Resp., DN 93 at PageID# 886–902. That is, she contends her Fourth Amendment claims fall squarely within *Bivens*, and her Fifth Amendment claims fall squarely within *Davis*. In truth, Enriquez-Perdomo's claims arise in new *Bivens* contexts for four reasons.

First, where a proposed claim presents "even a modest extension" of the factual or legal circumstances at issue in *Bivens* and its progeny, the claim arises in a new *Bivens* context. *Ziglar*, 582 U.S. at 147. And this case differs starkly from *Bivens* and *Davis*. In *Bivens*, a man's home was subjected to a warrantless search and, thereafter, the man was arrested without a warrant. *Bivens*, 403 U.S. at 389–90. In *Davis*, a woman was fired by a U.S. Congressman simply for being a woman. *Davis*, 442 U.S. at 230. But here, because of her ethnic origin, Enriquez-Perdomo was arrested and detained by ICE agents pursuant to a valid but non-executable Order of Removal. *See Enriquez-Perdomo*, 54 F.4th at 863–64. Enriquez-Perdomo's claims simply do not constitute garden variety warrantless seizure claims like those advanced in *Bivens*, nor a workplace sex

---

[8] That means, here, the court is tasked not with considering whether a damages action may proceed against these particular ICE agent defendants, but whether a damages action should proceed against ICE agents generally. *Egbert*, 596 U.S. at 496 (the proper inquiry is not whether the court is "competent to authorize a damages action" against a particular agent, "but against Border Patrol agents generally").

discrimination claim like that advanced in *Davis*. *See also K.O. by & through E.O. v. Sessions*, No. 20-5225, 2022 WL 3023645, at *3–4 (D.C. Cir. July 29, 2022) (per curiam) (case presents a new *Bivens* context when it "arises in the context of immigration detention").

Enriquez-Perdomo pushes back against this conclusion, submitting that the Sixth Circuit's decision in *Jacobs v. Alam*, 915 F.3d 1028 (6th Cir. 2019), requires the court to find that at least her Fourth Amendment claims are identical to *Bivens*. She relies on *Jacobs* because, in her view, it "is factually and contextually the same as this case and the *Jacobs* court" held that a *Bivens* action was not foreclosed. Resp., DN 93 at PageID# 889. But by no means is *Jacobs* factually "the same" as this case. *Jacobs* concerned the actions of deputized Special U.S. Marshals enforcing criminal law—not ICE agents enforcing immigration law—by conducting a home raid that resulted in a man being shot—not the detention of a DACA recipient pursuant to a valid, but unenforceable Order of Removal. Moreover, *Jacobs* was decided before the Supreme Court's decisions in *Hernández* (no *Bivens* action against U.S. Border Patrol agent) and *Egbert* (same), and the Sixth Circuit's decision in *Elhady* (same).[9] *Jacobs* simply does not control here.

Second, a meaningful difference may exist where the proposed claim is based "on the same constitutional provision as a claim" raised in *Bivens* or its progeny, *Hernández*, 589 U.S. at 103, when other "special factors" are present that those cases "did not consider," *Ziglar*, 582 U.S. at 140. Here, Enriquez-Perdomo alleges that Defendants denied her equal protection of the law because of her ethnic origin. *Davis* is the only *Bivens* case that arose in the equal protection context. It, however, concerned equal protection in the workplace-sex-discrimination context, not ethnic origin discrimination in the context of immigration law enforcement. *Davis*, 442 U.S. at 230–31.

[9] Notably, in *Elhady*, the Sixth Circuit applied *Hernández* to conclude that a "context is new if it differs in virtually any way from the *Bivens* trilogy." 18 F.4th 880 at 883.

These are differences with meaning. By way of example, such claims are subject to different legal standards: "courts apply strict scrutiny for classifications based on race, color, and national origin" and "intermediate scrutiny for classifications based on sex". *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181, 308–09 (2023) (Gorsuch, J., concurring).

Third, a difference is "'meaningful' if it might alter the policy balance that initially justified the causes of action recognized in *Bivens*, *Davis*, and *Carlson*," *Snowden v. Henning*, 72 F.4th 237, 244 (7th Cir. 2023); that is, "if *even one* distinguishing fact has the potential to implicate separation-of-powers considerations." *Tate v. Harmon*, 54 F.4th 839, 846 (4th Cir. 2022) (emphasis in original). When deciding *Bivens* and its progeny, the Supreme Court did not consider the policy ramifications for recognizing a damages remedy against ICE agents. A very complex bundle of policy considerations accompanies any decision that touches on foreign relations, such as DACA and immigration enforcement in general: "Foreign policy and national security decisions are delicate, complex, and involve large elements of prophecy for which the Judiciary has neither aptitude, facilities, nor responsibility." *Hernández*, 589 U.S. at 749 (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 284 (2018) (Gorsuch, J., concurring) (internal quotation marks omitted)). Such considerations, of course, raise complicated separation-of-powers concerns given that "[n]ational-security policy is the prerogative of the Congress and President." *Ziglar*, 582 U.S. at 142; *see Trump v. United States*, 603 U.S. ___, ___ (2024) (slip op. at 6) (the President "has important foreign relations responsibilities" including "managing matters related to terrorism, trade, and immigration") (emphasis added).

Fourth, a case meaningfully differs from *Bivens* and its progeny if it would extend *Bivens* to "a new category of defendants," *Egbert*, 589 U.S. at 492, or to defendants who operate under a different "statutory or other legal mandate" than those in the *Bivens* trilogy of cases, *Ziglar*,

582 U.S. at 140. In these ways, too, Enriquez-Perdomo's claims meaningfully differ from *Bivens*

and its progeny because:

(1) they implicate ICE agents, "while *Bivens* concerned the actions of agents of the Federal
Bureau of Narcotics," *Davis* concerned the actions of a U.S. Congressman, and *Carlson*
concerned the actions of federal prison officials, *Cain v. Rinehart*, No. 22-1893, 2023
WL 6439438, at *4 (6th Cir. July 25, 2023) (concluding that a *Bivens* action against a
deputy U.S. Marshal arose in a new context); and

(2) ICE agents enforce immigration law, not criminal law, and thus operate under a
different legal mandate. *Tun-Cos v. Perrotte*, 922 F.3d 514, 523–24 (4th Cir. 2019)
(ICE agents are a new category of *Bivens* defendant who operate under a different legal
mandate), *cert. denied*, 140 S. Ct. 2565 (2020); *Medina v. Danaher*, 445 F. Supp. 3d
1367, 1371–72 (D. Colo. Mar. 23, 2020) (same).

In Enriquez-Perdomo's view, neither of these differences are meaningful. For support, she

directs the court to four published district court decisions each holding that a *Bivens* action can lie

against ICE agents. Resp., DN 93 at PageID# 893. However, those decisions pre-date *Egbert* and

*Hernández* (and all but one pre-date *Ziglar*), and none are binding on this court. As the Sixth

Circuit observed pre-*Egbert*, "[e]very . . . circuit (except the Ninth) faced with an invitation to

expand Bivens to the border/immigration context has held firm" in declining to do so. *Elhady*, 18

F.4th at 886. The sole exception was *Boule v. Egbert*, 998 F.3d 370 (9th Cir. 2021), but "that

opinion is no longer on the books" because the Supreme Court reversed the Ninth Circuit in *Egbert*.

*Elhady*, 18 F.4th at 887; *Egbert*, 596 U.S. at 502.

Moreover, Enriquez-Perdomo suggests Defendants were enforcing criminal law, not

immigration law, so her case does not meaningfully differ from *Bivens*. Resp., DN 93 at PageID#

894–95. She cites no authority for this proposition, aside from an administrative regulation:

8 C.F.R. § 287.8(g). That regulation, however, serves one purpose: to ensure "criminal law

enforcement authorities" will act "in a manner consistent with" the U.S. Department of Justice's

and the U.S. Department of Homeland Security's ("DHS's") guidelines and policies. *Id.* The regulation does not posit that ICE agents enforce criminal law when executing removal orders.

*     *     *

Simply put, Enriquez-Perdomo's claims would "upset a straightforward application of *Bivens* or *Davis* or *Carlson*." *Snowden*, 42 F.4th at 244. So, they present new *Bivens* contexts. *Id.*

### 2. Congress is better suited to provide a remedy.

As this case arises in a new *Bivens* context, the court must consider whether any special factors suggest the Congress is better situated than it to create a damages remedy for Enriquez-Perdomo. Defendants argue that the Congress is better situated. Renewed Mot. Sum. Judg., DN 91 at PageID# 864–70. Enriquez-Perdomo disagrees. Resp., DN 93 at PageID# 902–07. The court agrees with Defendants for three reasons.

First, where a proposed *Bivens* claim implicates foreign relations, such as immigration, the Judiciary is inept—and, perhaps, dangerously so—to create a damages remedy. *Hernández*, 589 U.S. at 749. For that reason, "the Supreme Court has 'expressed open hostility to expanding *Bivens* liability,' especially in the immigration context." *Elhady*, 18 F.4th at 886 (quoting *Tun-Cos*, 922 F.3d at 521). Enriquez-Perdomo is a DACA recipient, and Defendants are ICE agents. Without question, both DACA and ICE are derivative of the United States' complex and comprehensive immigration enforcement regime. And "immigration enforcement is, at bottom, about ensuring that only those foreign nationals who are legally authorized to be in the United States remain present here," *Tun-Cos*, 922 F.3d at 526, so it has "the natural tendency to affect diplomacy, foreign policy, and the security of the nation," all "which . . . counsel hesitation in extending *Bivens*." *Mirmehdi v. United States*, 689 F.3d 975, 982 (9th Cir. 2012) (citation omitted); *Elhady*,

18 F.4th at 886 ("national security will always be a special factor counseling against extending *Bivens*").

Second, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Ziglar*, 582 U.S. at 137. Such is the case here: "immigration enforcement is 'a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere.'" *Tun-Cos*, 922 F.3d at 526 (quoting *Ziglar*, 582 U.S. at 137 and collecting cases). For proof, one need look no further than the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101, *et seq.*, which comprehensively regulates "all immigration related issues". *De La Paz v. Coy*, 786 F.3d 367, 375–78 (5th Cir. 2015). Notably, the INA does not include any damages remedies: "Despite its repeated and careful attention to immigration matters, Congress has declined to authorize damage remedies against individual agents involved in civil immigration enforcement." *Id.* at 377. Such congressional silence "does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation," *Schweiker v. Chilicky*, 487 U.S. 412, 421–22 (1988); rather, it "speaks volumes and counsels strongly against judicial usurpation of the legislative function," *De La Paz*, 786 F.3d at 377.

In arguing to the contrary, Enriquez-Perdomo directs the court to a law review article penned by Harvard Law School's Story Professor of Law, Richard H. Fallon, Jr., for the proposition that the First Congress "presupposed a background scheme of common law and equitable remedies through which the Constitution could be enforced and rights vindicated." Resp., DN 93 at PageID# 903 (quoting Richard H. Fallon, Jr., *Constitutional Remedies: In One Era and*

*Out the Other*, 136 HARV. L. REV. 1300, 1311 (2023)). As explained earlier in this Opinion, that proposition is true. *Infra* § IV.A. However, in the intervening centuries since the Founding, and particularly after the merger of law and equity in federal court, the Supreme Court largely eliminated the common law, *Erie*, 304 U.S. at 78, and thus, now doubts the legitimacy of its implied judicial power to create causes of action for constitutional harms, *see, e.g.*, *Egbert*, 596 U.S. at 491. Indeed, the thrust of Professor Fallon's article is that a cause of action like that advanced by Enriquez-Perdomo might have proved successful one-hundred years ago, but no longer: "In a historical and analytical vein, I have argued that the current Supreme Court has substantially deviated from the traditional understanding of the relationship between constitutional rights and constitutional remedies, . . . [i]n particular, I have maintained, the Court has rejected the idea of a congressional-judicial partnership in creating rights to constitutional remedies that undergirded the traditional law." Fallon, 136 HARV. L. REV. at 1365. This history does not help Enriquez-Perdomo today.

Third, the availability of even one adequate alternative remedy is sufficient to foreclose a *Bivens* action: "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Ziglar*, 582 U.S. at 145. Two were available to Enriquez-Perdomo:

(1) the INA's "elaborate remedial system," *Bush v. Lucas*, 462 U.S. 367, 388 (1983), which, among other things, sets forth "[s]tandards for enforcement activities," 8 C.F.R. § 287.8, and provides an "[e]xpedited internal review process" for alleged violations of those standards, *id.* at 287.10; and

(2) habeas relief.

However, Enriquez-Perdomo argues that these remedies were either unavailable to her, inadequate, or both. Resp., DN 93 at PageID# 905–07. Specifically, she submits that the INA's grievance procedure is available only to those aggrieved during removal proceedings. *Id.* at PageID# 905. Moreover, she submits that even if the INA grievance process was available to her,

it lacks adequate constitutional safeguards to discourage future constitutional violations. *Id.* at PageID# 905–06. Regarding habeas relief, Enriquez-Perdomo concedes that it "is always theoretically available to every Plaintiff"; however, she contends that, as applied to her, habeas relief was an inadequate remedy because the U.S. District Court for the Eastern District of Kentucky did not review her petition before it became moot. *Id.* at PageID# 906–07.

*Egbert* shuts the door to Enriquez-Perdomo's INA arguments.[10] There, a U.S. citizen— alleged to be a human smuggler—contended that he was assaulted by a U.S. Border Patrol agent at his home, which happened to straddle the U.S.-Canadian border. *Egbert*, 596 U.S. at 488–90. He filed an INA grievance against the agent and was allegedly retaliated against for doing so. Notably, the alleged unconstitutional conduct took place *outside* of the removal context. No action was taken against the agent after a year-long investigation. *Id.* The plaintiff later filed suit under a *Bivens* theory. Thus, the following question was squarely before the Supreme Court: is the INA an adequate alternative remedy such that it precludes a *Bivens* action?

To answer the question, the Supreme Court set forth certain principles relevant to its consideration of the INA's adequacy. Namely, the Supreme Court explained that "*Bivens* 'is concerned solely with deterring'" unconstitutional conduct, thus, "the focus is whether the Government has put in place safeguards to 'prevent' constitutional violations 'from recurring.'" *Id.* at 498 (quoting *Malesko*, 534 U.S. at 71) (original alteration omitted). Moreover, the Supreme Court observed that the adequacy of an alternative remedy is "a legislative determination that must be left to Congress, not the federal courts." *Id.* Therefore, so "long as Congress or the Executive

---

[10] Enriquez-Perdomo cites only two authorities in support of her contrary position, and both are district court decisions from outside the Sixth Circuit that pre-date *Egbert*. Resp., DN 93 at PageID# 905 (citing *Prado v. Perez*, 451 F. Supp. 3d 306, 316 (S.D.N.Y. 2020); *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 128 (D. Conn. 2010)).

has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.*

Applying these principles, the Supreme Court determined the INA has two constitutionally adequate safeguards: (1) 8 U.S.C. § 1103(a)(2), which requires DHS to "control, direc[t], and supervis[e] . . . all employees" (which include U.S. Border Patrol *and* ICE agents), *id.* at 497; and (2) the INA's accompanying regulations, which provide that aggrieved individuals can complain about improper conduct to DHS, prompting DHS to investigate, *id.* Because the Supreme Court was without "warrant to doubt" that the INA's grievance procedures secure "adequate deterrence," it held that the INA affords plaintiffs an adequate "alternative remedy." *Id.*

Likewise, Enriquez-Perdomo's habeas relief argument misses the mark. First, relevant to adequacy, both the Supreme Court and Sixth Circuit have observed that habeas relief may be a "more direct route to relief" than a damages action. *Ziglar*, 582 U.S. at 145; *Jacobs*, 915 F.3d at 1038. And second, what is relevant to the availability and adequacy inquiries is not whether a plaintiff could successfully attain relief through an alternative remedy; no, what matters is whether an adequate alternative remedial process was available to the plaintiff: "So long as the plaintiff had *an avenue* for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." *Malesko*, 534 U.S. at 69 (emphasis added); *see Egbert*, 596 U.S. at 489–90 (the availability of the INA grievance procedure was adequate despite plaintiff's lack of success attaining relief using it). As Enriquez-Perdomo concedes, habeas relief was available to her, Resp., DN 93 at PageID# 906, and she made use of it, *Enriquez-Perdomo*, 2018 WL 934854, at *2. Here, that is sufficient to foreclose a *Bivens* action. *Alvarez v. ICE*, 818 F.3d 1194, 1208–09 (11th Cir. 2016) (availability of habeas relief and the INA's grievance procedure weigh against recognizing a *Bivens* remedy); *Mirmehdi*, 689 F.3d at 982–83 (same).

**V. Conclusion**

Crediting Enriquez-Perdomo's account of the facts, her arrest and subsequent detention by ICE agents was not contemplated by *Bivens* or *Davis*; therefore, her various Fourth and Fifth Amendment claims arise in new *Bivens* contexts. Moreover, there are several reasons "to think Congress might be better equipped to create a damages remedy" in these new contexts, so the court must decline Enriquez-Perdomo's invitation for it to extend *Bivens*' reach. *Egbert*, 596 U.S. at 497. Accordingly, Defendants are entitled to a judgment as a matter of law and Defendants' renewed Motion for a summary judgment, DN 91, will be **GRANTED** as to all claims by subsequent Order entered contemporaneously.

**IT IS SO ORDERED.**

July 8, 2024

Charles R. Simpson III, Senior Judge
United States District Court